Gary **ODESSER** and Anita **Odesser**

v.

**CONTINENTAL BANK, et al.**

No. 86-7265.

United States District Court,
E.D. Pennsylvania.

Nov. 13, 1987.

William B. Lytton, Harold E. Kohn, Joanne Zack, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for plaintiffs.

Alan C. Gershenson, Zenola Harper, Comisky & McCauley, Blank, Rome, Philadelphia, Pa., for Continental Bank.

Timothy J. Gorbey, Gorbey & Gorbey, Media, Pa., for Frankford Trust Company.

Thomas J. Ziomer, White & Williams, Philadelphia, Pa., for Gary Jaffe.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This case is before me on defendants' motions to dismiss. The complaint of plaintiffs Gary and Anita Odesser[1] alleges that defendants Continental Bank ("Continental") and Gary Jaffe, Esq. ("Jaffe"), acting through a pattern of racketeering, and by conspiring with, aiding and abetting Howard Vogel ("Vogel"), participated in wrongfully obtaining control over Philadelphia Video Exchange ("PVE," "the company") and ousting its founder and former president, Gary Odesser ("Odesser") from the company. The complaint also alleges a variety of pendent state claims against Jaffe and Continental, and one against a third defendant, Frankford Trust Company ("Frankford"). Frankford cross-claimed against Continental and Jaffe, incorporating the allegations of Odesser's complaint against them. Defendants Jaffe and Continental have each moved on substantially similar grounds to dismiss the complaint for failure to state a claim. Continental has also moved to dismiss Frankford's cross-claim, incorporating by reference its motion to dismiss Odesser's complaint.

The complaint presents nine counts. The first four counts allege RICO violations under 18 U.S.C. § 1962(a)–(d). Count I alleges that Jaffe and Continental aided and abetted Vogel in receiving income from a pattern of racketeering activity and investing that income to acquire an interest in and operate PVE in violation of § 1962(a). The pattern is alleged as comprised of acts of mail and wire fraud, obstruction of justice, and interstate transportation and sale of stolen goods. Count II alleges that Jaffe and Continental aided and abetted Vogel in maintaining an interest in and control of PVE through a pattern of racketeering activity in violation of § 1962(b). Count III alleges that Jaffe and Continental are directly liable for violating § 1962(c), which prohibits those associated with or employed by an enterprise from conducting the enterprise's affairs through a pattern of racketeering. Count IV alleges that Jaffe, Continental and Vogel conspired to violate § 1962(a)–(c), as prohibited by § 1962(d).

The remaining five counts are a variety of pendent state law claims, including: violation of Pennsylvania's RICO provision, 18 Pa.C.S.A. § 911(b)(1)–(4); fraudulent breach of fiduciary duty in violation of 7 Pa.S.A. §§ 6381, 6392; civil conspiracy; intentional infliction of emotional distress; and a ninth count against Jaffe alone for legal malpractice. Only the sixth count, the state law claim for breach of fiduciary duty, does not name Jaffe, and names defendant Frankford Trust Company alongside Continental. Continental and Jaffe are the defendants in all counts except for the sixth and ninth.[2]

---

1. Anita Odesser is named as a plaintiff in this case, as she was in the Odesser's suit against Howard Vogel, but in neither case does she have standing to sue. *See Odesser v. Vogel,* No. 85–6931, slip op. at 6, n. 7 (E.D.Pa. Nov. 5, 1986) [Available on WESTLAW, 1986 WL 12769]. The complaint in this case, like that in *Vogel,* does not allege that Anita Odesser was injured in her business or property in such a way as to give her standing to sue under 18 U.S.C.1964(c). Plaintiffs, in their memorandum of law, admit that Anita Odesser has no standing to sue with respect to the bulk of the counts. Plaintiffs contend that Anita Odesser does, however, have standing to sue with respect to the claims of

intentional infliction of emotional distress and legal malpractice. The former claim is dismissed in its entirety, *see, infra,* at 1316. Anita Odesser thus remains a plaintiff in this suit with respect to the malpractice count only, and the remainder of this memorandum refers to Gary Odesser as the sole plaintiff.

2. The caption to Count VIII names Vogel, rather than Jaffe, alongside Continental, but because the text of that count refers to Jaffe, and because Vogel is not a defendant to this complaint, the court assumes that Vogel was named only as a result of typographical error, and will

This case is related to *Odesser v. Vogel,* No. 85–6931 (E.D.Pa. filed Dec. 3, 1985), in which this court has already considered a motion to dismiss by the defendant in that case, Howard Vogel. By Memorandum and Order dated November 5, 1986, I dismissed a securities fraud claim in Odesser's second amended complaint, but denied dismissal of the RICO count based on at least two remaining predicate acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343) and obstruction of justice (18 U.S.C. § 1961(1)(B)). I also granted plaintiff leave to amend the pleadings to cure defects in the allegations of transportation and sale of stolen goods. Although the action against Vogel is the centerpiece of this dispute, the issues now before the court concern those parties alleged to have assisted Vogel in wrongfully obtaining control over PVE and finally depriving Odesser of his interest in and control of the corporation.

*The Facts as Alleged*

The factual allegations of Odesser's complaint against Continental, Jaffe, and Frankford are as follows: Odesser in 1981 established a wholesale business that dealt in used video film in the Philadelphia area. (Para. 9). Odesser incorporated Philadelphia Video Exchange in Pennsylvania in 1983. (Para. 10). By 1984, PVE was run by co-owners Odesser and David Schaffer, (Para. 10), had annual sales of $9 million, 17 employees, and dealt with over 1,700 video retailers as customers. (Para. 11). During the second half of 1984, Vogel allegedly infiltrated and took control of PVE. (Paras. 12–13). He bought a one-third interest in PVE for $100,000 cash and a $200,000 letter of credit, (Para. 13), and soon increased his interest to one-half in February of 1985 by arranging for PVE to borrow $225,000 from defendant Continental Bank and to use those funds to repurchase Schaffer's interest. (Para. 14).

Vogel next worked with the help of Continental to remove Odesser from the corporation. Vogel created a cash flow shortage in PVE, arranged for the company to borrow needed cash from Vogel, and induced

Odesser to pledge his shares as security for Vogel's loan. (Paras. 15–16). He then prevented PVE from repaying the loan, so that Odesser would have to surrender his shares. (Para. 17). The loan agreement, signed on August 31, 1985, was drafted on August 15, 1985, by defendant Gary Jaffe, Esq., who was at that time lawyer for Odesser, Vogel, and PVE, but is alleged to have acted only in the interests of Vogel. (Para. 16). After the loan was secured, Vogel continued to create a bank overdraft on PVE's account with Continental Bank that reached approximately $80,000 by the end of October, 1985. (Para. 18). When Odesser made an attempt to repay $77,000 of the loan before it became due on October 31, 1985, (Para. 17), Vogel refused to accept payment, instead directing Odesser to deposit the payment in PVE's overdrafted Continental account. (Para. 18). On October 31, 1985, Vogel demanded delivery of Odesser's shares. (Para. 19). Odesser, by an attorney, directed Jaffe not to deliver the shares, and consequently Jaffe still holds those shares in escrow on Odesser's behalf. (Para. 19).

Despite Odesser's continuing interest in PVE, and his position as the Company's president, (Para. 19), Continental Bank officer Gary Warnalis, together with Vogel, represented to PVE employees that Odesser was no longer an officer or director of PVE. (Para. 21). Warnalis told Odesser and PVE employees that Odesser would no longer be able to draw checks on PVE's bank account at Continental. (Para. 21). Vogel locked Odesser out of PVE's offices and warehouses. (Para. 20). Vogel and Warnalis on November 1, 1985 "caused a false and fraudulent 'Board of Directors' resolution to be created, which stated that Vogel was President and his wife was secretary of PVE and that only Vogel, as 'President,' was empowered to draw funds from PVE's authorized bank account at Continental." (Para. 22). Odesser never received notice of any shareholders' meeting, shareholders' election of directors, or directors' election of new officers, all of which he alleges would be required by PVE

treat Count VIII as if it named Jaffe instead of Vogel.

by-laws and Pennsylvania state law for Vogel's and Warnalis' resolution to be valid. (Para. 23).

In late 1985 and early 1986, "Continental allowed Vogel to draw checks totalling at least $1,200,000 on PVE's account at Continental. Continental claimed that the fraudulent and void November 1, 1985, resolution was valid and controlling. Continental honored the November 1, 1985, fraudulent and void resolution despite its knowledge that Vogel had not foreclosed Odesser's stock and therefore was not the sole owner of PVE." (Para. 25). Odesser alleges that Continental demonstrated its knowledge that the November, 1985, resolution was fraudulent when, by letter dated March 4, 1986, it acknowledged the validity of a February, 1985, Board of Directors' resolution authorizing both Odesser and Vogel to draw checks on PVE accounts. (Para. 28).

Defendants Continental and Jaffe nonetheless continued to cooperate with Vogel to deprive Odesser of control over PVE and access to funds, to allow Vogel control and access, to frustrate Odesser's attempts to abolish his fraudulently created loan obligation to Vogel, and to press for payment by Odesser to Vogel and other creditors of PVE. Specifically, the complaint alleges that in October, 1985, Vogel directed Jaffe to have East Texas Distributing Company ("East Texas"), a longstanding creditor of PVE, shift the $50,000 lien it held on Odesser's personal residence as security for a PVE debt to a new personal home Odesser purchased in June, 1985. (Para. 32). Jaffe arranged to add a confession of judgment clause to Odesser's guarantee, and to eliminate such a clause with respect to PVE. Jaffe misrepresented to Odesser the terms of the agreement between PVE and East Texas. (Para. 33). When, in October, 1985, Odesser appeared at the closing on the sale of his old residence, "Jaffe advised Odesser that, unless he agreed to grant East Texas a $50,000 lien on his old residence; Odesser would be unable to sell his old residence; and Odesser would be in breach of the contract to the buyer of his old residence." (Para. 33).

The complaint further alleges that "[f]rom March 4 to 14, 1986, Continental and Vogel conspired to have the PVE account at Continental overdrawn at all times so that Odesser could not withdraw any funds from that account." (Para. 29). Despite notice from Odesser's attorney that PVE funds could not be transferred without authorization by the Board of Directors, "[o]n or about March 14, 1986, all of the corporate funds of PVE were transferred at Vogel's direction from Continental to Frankford." (Para. 30). "To accomplish this transfer, Continental agreed to indemnify and hold Frankford harmless against all loss." (Para. 30).

Continental also allegedly participated in ensuring that Odesser had no resources, even independent of PVE's account, with which to contest Vogel's scheme to control PVE. "On or about May 7, 1986, Continental entered a confession of judgment in the amount of $761,917.63 against plaintiffs on an Unlimited Surety Agreement executed by plaintiffs on September 26, 1984, pursuant to which plaintiffs guaranteed certain indebtedness of PVE to Continental." (Para. 34). Odesser alleges that Continental wrongfully confessed judgment, because Odesser's obligation to repay on PVE's behalf extended only "until one month after written notice of termination was given to Continental by Odesser." (Para. 35). Only $250,000 of the $475,000 obligation underlying Continental's confession of judgment was incurred prior to November 1, 1985, (Para. 35)—the date of the fraudulent Board of Directors' resolution pursuant to which Continental had stopped recognizing Odesser's role in PVE —and "Continental had already collected more than $250,000 from the proceeds of sales of assets of PVE." (Para. 35). The complaint thus suggests that when Continental confessed judgment against Odesser to collect on PVE's indebtedness, the only portion of the debt that Odesser might plausibly be held responsible for had already effectively been repaid.

In its final step, "[o]n or about May 15, 1986, Continental had issued a Writ of Execution directed to the Sheriff of Bucks County to levy upon and sell the contents

of plaintiffs' home. The Sheriff levied on such contents on July 3, 1986." (Para. 35). "On or about November 10, 1986, Continental brought a Mortgage Foreclosure action against plaintiffs, with respect to the new personal residence purchased by them." (Para. 36).

Defendants Continental Bank and Gary Jaffe now move to dismiss the RICO counts for failure to state a claim. The defendants also seek dismissal of the state claims because they are pendent from the challenged federal claims. Jaffe's motion opposes the state claims on their merits in addition to asserting that they have no jurisdictional basis.

### The Requirement of a Pattern of Racketeering Activity

■ The first basis of each defendant's contention that plaintiffs have not sufficiently pleaded a RICO claim is that plaintiffs have not met the requirement of showing a "pattern" of racketeering activity. As defendants point out, each subsection of 18 U.S.C. § 1962 requires allegations of predicate acts of racketeering which comprise a pattern of racketeering activity. Defendants contend that plaintiffs must plead predicate acts that comprise more than a single scheme of racketeering activity in order to fulfill the statutory pattern requirement. As defendants read Odesser's complaint, it does not allege multiple schemes, but only multiple acts in furtherance of a single scheme to remove Odesser from his position of control in PVE.

In my opinion disposing of Howard Vogel's motion to dismiss plaintiff's complaint against him, I considered the scope of the pattern requirement in view of *Sedima v. Imrex*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), and found plaintiff's allegations of predicate acts No. 85–6931, slip op. at 20–22 (E.D.Pa. Nov. 5, 1986). The pattern allegations here are substantially the same as those in the *Vogel* case, and I find them still sufficient on the grounds there stated. The correctness of that analysis is confirmed by the recent decision of the Court of Appeals for the Third Circuit in *Barticheck v. Fidelity Union Bank*, 832 F.2d 36 (1987).

### Allegations Relating Jaffe and Continental to Vogel's Scheme

Defendants Jaffe and Continental next challenge the complaint on three separate bases that share a common theme of attempting to show both defendants to be peripheral actors in the alleged racketeering scheme, too tenuously connected to plaintiff's harm to be held liable even under theories aimed at secondary actors. Defendants contend that the complaint fails to allege claims against either of them for: (1) participation in the conduct of PVE's affairs through a pattern of racketeering in violation of § 1962(c); (2) conspiring to commit a RICO violation, as prohibited by § 1962(d); or (3) aiding and abetting Vogel in violating § 1962(a) or (b).

### a. 18 U.S.C. § 1962(c) Allegations

■ The allegations of plaintiff's complaint, defendants contend, do not reflect sufficiently active involvement by Jaffe or by Continental in the affairs or management of PVE to state a claim under § 1962(c), which makes it unlawful for any person "employed by or associated with" any interstate enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In response, plaintiff emphasizes that the statute, by its terms, reaches even persons who are merely "associated with" an enterprise, and who have participated only "indirectly" in its affairs. Plaintiff contends that "conduct of [an] enterprise's affairs" does not necessarily mean participation in management, but "simply means the performance of activities necessary or helpful to the operation of the enterprise." Plaintiff's Memorandum of Law in Opposition to [Continental's] Motion to Dismiss at 13. Plaintiff's view is the one that commended itself to the Eleventh Circuit in *Bank of America Nat'l Trust & Sav. Assoc. v. Touche Ross & Co.*, 782 F.2d 966, 970 (11th Cir.1986); *accord Hill v. Equitable Bank*, 655 F.Supp. 631,

**1312**

652 (D.Del.1987); *Pappas v. NCNB Natl. Bank,* 653 F.Supp. 699, 703 (M.D.N.C. 1987); *Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 656 F.Supp. 49, 86 (S.D.Ohio 1986); *In re National Mortgage Equity Corp. Mortg. Pool,* 636 F.Supp. 1138, 1171 (C.D.Cal.1986).

Plaintiff's allegation in support of its § 1962(c) claim, (para. 52), tracks the language of that statutory subsection. Plaintiff also, however, points to its allegations that Jaffe drafted the escrow agreement embodying the loan from Vogel to PVE, (paras. 46(a) and (2)), by which Odesser was allegedly ousted from PVE, and that Jaffe negotiated the agreement among Odesser, PVE and East Texas, (para. 32), by which Odesser was allegedly rendered helpless to oppose his removal from the company. With regard to Continental, plaintiff also points to specific allegations that the bank stopped honoring PVE checks signed by Odesser, (para. 45(a)), and honored checks by Vogel to assist Vogel in wresting control of the company from Odesser, as well as his allegations that Continental aided Vogel in transferring PVE funds from Continental out of Odesser's reach, to Frankford Trust Co. (paras. 28–30). I agree with plaintiff and with the several courts that have adopted the reasoning of the Eleventh Circuit in *Bank of America Nat'l Trust & Sav. Assoc. v. Touche Ross & Co.,* 782 F.2d 966, regarding the scope of § 1962(c). Plaintiff's view of the scope of subsection (c) is supported by that subsection's language. The statute reaches an enterprise's outsiders as well as insiders, and those who participate indirectly as well as directly in an enterprise's affairs. Plaintiff's allegations regarding the participation of Continental and Jaffe in the conduct of PVE's affairs are sufficient to state a claim under § 1962(c).[3]

**b. Conspiracy Allegations**

The next argument for dismissal advanced by Jaffe and Continental is that plaintiff's allegations of a RICO conspiracy fail to state a claim. The provision of RICO that prohibits conspiracies, § 1962(d), states:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

The Third Circuit in *Seville Indus. Machinery v. Southmost Machinery* has remarked in a footnote that § 1962(d) prohibits "conspiracies to knowingly further the affairs of the enterprise," and that 'mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)." 742 F.2d 786, 792 n. 8 (3d Cir.1984) *cert. denied* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). More comprehensive knowledge is required: the complaint must contain allegations that defendants knew of the pattern and its aim. In sum, in order to state a claim under subsection (d), a plaintiff must allege (1) agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate § 1962(a), (b), or (c). *See id.*

Defendants contend that Odesser must also allege that the moving defendants themselves committed two or more predicate acts of racketeering. It is not, however, necessary that defendants to a conspiracy each have committed predicate acts of racketeering. The standard in our circuit is that "a defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts." *United States v. Adams,* 759 F.2d 1099 (3d Cir.) *cert. denied* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985). Although *Adams* was a criminal case, the

---

**3.** Defendants' strongest case support for their proposition that, under § 1962(c), plaintiff must allege that defendants were directly involved in the management or operation of the enterprise is *Bennett v. Berg,* 710 F.2d 1361 (8th Cir.) *cert. denied* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). But even the Eighth Circuit in *Bennett* declined to affirm on this ground the district court's dismissal of the RICO allegations. Instead, the court merely pointed to the allegations of defendants' involvement as a potential weakness in the complaint and advised that a motion for a more definite statement of the § 1962(c) claim might be useful. *See id.* at 1364.

standard for civil RICO conspiracy is no more stringent. It is enough to show that defendants agreed to commit predicate acts, and knew that those acts were part of a pattern conducted to violate one of the first three subsections of § 1962.

■ Defendants characterize the complaint in this case as merely tracking the language of § 1962(d) to make conclusory allegations that are insufficient to state a claim under that subsection. Plaintiff responds that extraordinary specificity is not required for a complaint to state a claim of conspiracy, but that it merely must meet the requirements of Federal Rule of Civil Procedure 8. Plaintiff is correct that allegations of conspiracy are not measured under the rule 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal rule 8 pleading standard. *See Alfaro v. E.F. Hutton & Co., Inc.*, 606 F.Supp. 1100, 1117 (E.D.Pa.1985). Even rule 8, however, requires more than a conclusory allegation based on the language of the statute which plaintiff claims was violated. A complaint should "describe the general composition of the conspiracy, some or all of its broad objectives, and defendants' general role in that conspiracy." *Id.* at 1117–18.

■ As plaintiff also points out, however, his conspiracy claim does not exclusively rest on the conclusory allegation of paragraph 56, in which his § 1962(d) count is presented. Instead, the claim incorporates all plaintiff's factual allegations of particular acts by Jaffe and Continental. Under the conspiracy standard recited in *Seville* and the standard of pleading described in *Alfaro*, plaintiff's allegations against Jaffe withstand dismissal. In alleging that Jaffe failed to disclose to Odesser Vogel's plan to oust Odesser, "despite Jaffe's knowledge of Vogel's intentions," (para. 46(c)), plaintiff's complaint gives fair notice to Jaffe that plaintiff has a reasonable basis upon which to conclude that Jaffe agreed to participate in Vogel's fraud with an understanding of Vogel's plan to commit actions that would amount to a RICO violation.

■ Plaintiff's allegations against Continental are, however, more narrowly framed, and do not include an assertion that Continental was aware of Vogel's larger plan. The only knowledge that plaintiff alleges on Continental's part is that it honored the allegedly fraudulent November 1, 1985, Board resolution despite having been on notice that the resolution was invalid. (Paras. 28–30). That allegation of Continental's knowledge is insufficient to support a claim that Continental conspired with Vogel or Jaffe to violate § 1962(a), (b) or (c).

c. Aiding and Abetting Allegations

■ Defendants next contend that the complaint not only fails to implicate the moving defendants as principals under 1962(c) of (d), but that it fails even to state claims against them as aiders and abettors. As the Third Circuit recently held, "if all of RICO's other requirements are met, an aider and abettor of two predicate acts can be civilly liable under RICO." *Petro–Tech v. Western Co. of North America*, 824 F.2d 1349, 1356 (3d Cir.1987). An aiding and abetting claim must be based on allegations of:

1. an independent wrong by a primary actor

2. the aider and abettor's knowledge of that wrong

3. "substantial assistance" by the aider and abettor in the achievement of the violation by the primary actor.

*See Walck v. American Stock Exchange*, 687 F.2d 778, 791 (3d Cir.1982), *cert. denied* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983), *citing Landy v. Federal Deposit Insurance Corporation*, 486 F.2d 139, 162–63 (3d Cir.1973) *cert. denied* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

■ Plaintiff, in his complaint in the related lawsuit, has adequately alleged predicate acts by Howard Vogel. *See Odesser v. Vogel*, Civil Action No. 85–6931 (E.D.Pa. Nov. 5, 1985). Vogel allegedly committed mail and wire fraud, and ob-

struction of justice.[4] The question, then, is whether plaintiff has alleged that defendants Continental and Jaffe, with the requisite knowledge, substantially assisted Vogel in the commission of those acts.

The obstruction of justice claim is based upon allegations that Vogel threatened Wilbur Pierce, a potential witness. Neither Jaffe nor Continental is alleged to have played any part in those threats. The complaint thus states no claim that either moving defendant aided and abetted Vogel's alleged obstruction of justice.

Plaintiff's complaint does, however, include allegations that Continental and Jaffe substantially assisted Vogel in predicate acts of wire and mail fraud. The allegations that Continental assisted Vogel—by mailing a copy of the fraudulent Board resolution to third parties with the knowledge that it was invalid, and in transferring PVE's funds out of its account at Continental despite being on notice that the transfer did not have authorization from Odesser as allegedly required under an earlier, valid Board resolution (paras. 42(k)–(1), 45)—show a sufficient degree of knowing assistance by Continental in Vogel's predicate acts of fraud to withstand dismissal. Allegations that Jaffe drafted the Vogel loan agreement and negotiated the East Texas lien with an understanding that those arrangements were undertaken in order to defraud Odesser, (para. 46), similarly suffice to show Jaffe's knowing and substantial assistance.

### Particularity of Allegations of Fraud

Defendants' final line of attack on plaintiff's claims under the federal RICO statute is that the complaint does not allege fraud with the degree of particularity required by rule 9(b). The heightened standard of particularity applies in this case only to plaintiff's allegations of predicate acts of mail and wire fraud, and to his state-law claim of fraudulent breach of fiduciary duty, as these are the only fraud allegations in the complaint. The state-law fraud claim apparently rests on the same factual allegations as the alleged predicate acts of fraud, and therefore need not be considered separately here.

 As defendants acknowledge, the Third Circuit's standard of pleading under rule 9(b) is a generous one. The court's opinion in *Seville* explains that the "circumstances" of fraud must be specified in order to "place defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." 742 F.2d at 791. Plaintiffs are free, however, to particularize their claims of fraud in any way that serves those ends. They need not plead date, time, and place if they are able to use some alternative means to give "precision" and "substantiation" to the claims. *Id.*

Under *Seville*, plaintiff's fraud allegations must withstand a case-specific evaluation, made with a view to the policies to be served by rule 9(b). Jaffe objects that, upon reading the complaint, he cannot discern "what acts he allegedly aided and abetted or how he aided and abetted them," or "what acts he allegedly conspired to commit." Memorandum of Law in Support of Defendant Gary Jaffe's Motion to Dismiss at 16. It is true that the complaint

---

**4.** Plaintiff's complaint in *Odesser v. Vogel* includes allegations of predicate acts of interstate transportation of stolen property. The complaint does not allege that Vogel himself stole or sold PVE films, but rather states that he "caused film inventory with a value in excess of $5,000 to be removed from PVE and to be sold outside of Pennsylvania, without recording such transactions on the books or records of PVE and without remitting the proceeds of such sales to PVE." (para. 44(a)(i)). As I noted in my November 5, 1986, opinion in *Odesser v. Vogel,* such allegations do not explain how defendant is indictable as a principal under 18 U.S.C. §§ 2314–15. No. 85–6931, slip op. at 20 (E.D.Pa.

Nov. 5, 1986). Plaintiff nonetheless argues that Continental's assistance to Vogel in creating the allegedly fraudulent Board of Directors' resolution and its failure to honor checks signed by Odesser on PVE's account helped Vogel remove the PVE inventory. The connection between Continental's alleged acts and the imperfectly alleged transportation and sale of stolen goods by Vogel remains unclear, however, despite plaintiff's attempt in his memorandum to draw it. I therefore conclude that no allegation has been made that is sufficient to notify Continental that plaintiff claims it substantially assisted Vogel in interstate transportation of stolen goods.

does not distinguish facts forming the basis of aiding and abetting claims in Counts I and II from those supporting the conspiracy claim in Count IV, but such distinction is not required by rule 9(b). Moreover, plaintiff has described certain conduct of Jaffe with substantial particularity: drafting the loan agreement for Vogel, participating with Vogel in an interstate telephone call regarding that loan, and negotiating the East Texas lien.

The circumstances of the loan agreement are pleaded with sufficient specificity to withstand dismissal under rule 9(b). The complaint states that the loan was from Vogel to PVE in the amount of $100,000, with Odesser pledging his shares as security. (Para. 16). It was drafted as an escrow agreement by defendant Jaffe, dated August 15, 1985, and signed on August 31, 1985. *Id.* It was payable in 60 days, and carried a 16½% interest rate. *Id.* Negotiations by which Vogel induced Odesser to enter into the loan took place by telephone, between Vogel in California and Odesser in Pennsylvania. (Para. 42(b)). Vogel also discussed the loan with Jaffe via interstate telephone calls. (Paras. 42(c), 46(b). Jaffe knew that Vogel intended to use the loan to gain control over PVE, (Para. 46(c)), and hence that the representations by Vogel regarding his intentions toward Odesser, and regarding Odesser's access to repayment funds (Paras. 16(a) and (c)), were false. Jaffe nonetheless assisted Vogel in obtaining the loan in a way that fraudulently concealed Vogel's intentions from Odesser. (Para. 46(c)).

The circumstances of the East Texas lien are described in the complaint with less detail, but are nonetheless adequately alleged. Before Vogel entered the picture, East Texas was a creditor of PVE. (Para. 32). Odesser had guaranteed, with a lien on his own personal residence, the $50,000 that his company owed to East Texas. *Id.* In 1985, in order to prevent plaintiff from using his own financial resources to contest Vogel's takeover of PVE, Vogel enlisted Jaffe's help to use the lien to extort from Odesser his agreement to add a confession of judgment clause in his guarantee to East Texas (Para. 32): the lien was on

Odesser's old residence, and at the closing on the sale of that residence, on October 18, 1985, Jaffe advised him that East Texas would not remove the lien from his old house so as to enable Odesser to carry through with the contract of sale—and avoid the liability he would face if he breached—unless Odesser granted East Texas a $50,000 lien on his new house. (Para. 53). The new lien included a confession of judgment clause against Odesser, and such a clause was simultaneously eliminated with respect to PVE. (Para. 32).

It is clear from these allegations what fraudulent acts Jaffe is alleged to have participated in. He is therefore adequately placed on notice by plaintiff's complaint that, in order to defend against plaintiff's fraud allegations, he would need to overcome or discredit any evidence that plaintiff may present to prove his allegations that the loan and lien agreements were fraudulently obtained.

██ Continental, too, argues that allegations of fraudulent acts involving it are not particular enough to comport with rule 9(b). Continental contends that it "cannot decipher exactly what it did and the fraud in which it allegedly participated." Memorandum of Law Supporting Continental Bank's Motion to Dismiss at 13. The acts plaintiff alleges Continental committed include the following: Continental helped Vogel create a cash-flow shortage in PVE while Odesser still controlled the company by returning checks unpaid to PVE in August 1985. (Para. 45(a)). Continental did so in order to assist Vogel in gaining control of the company. *Id.* Gary Warnalis, an officer of Continental, went to the PVE offices on November 1, 1985, to assist Vogel in convincing PVE's employees that Vogel, and not Odesser, would henceforth be in charge of PVE. (Paras. 20–21, 45(b)–(c)). It was Warnalis who told PVE's bookkeeper, and Odesser himself, that Odesser would no longer be able to sign PVE checks. (Paras. 21, 45(c)). On the same day, Warnalis also helped Vogel to draft the fraudulent Board of Directors' resolution, unilaterally eliminating Odesser from the Board and replacing him with Vogel as

president. (Paras. 22, 45(b), (c)). Only members of Vogel's new Board were authorized to draw funds from the account at Continental on behalf of the corporation. After November 1, 1985, Continental honored Vogel's but not Odesser's checks on the PVE corporate account. (Para. 45(c)). The bank asserted to third parties that the November 1, 1985, Board of Directors' resolution was valid despite its knowledge to the contrary. (Paras. 45(d), 28).

Subsequent to aiding Vogel in establishing the new *status quo* at PVE, Continental assisted Vogel in keeping PVE funds out of Odesser's reach. (Paras. 30, 45(f), (g)). Finally, Continental confessed judgment against Odesser on PVE indebtedness incurred after the bank itself had ceased to recognize any role of Odesser in the company. (Paras. 34–35, 45(h)). These allegations are sufficiently particular to support Odesser's claim that Continental participated in Vogel's fraudulent acts.[5]

*Pendent Claims*

Defendants have moved to dismiss plaintiff's state claims for lack of pendent jurisdiction. In view of surviving federal claims against the moving defendants, however, this court retains jurisdiction over the state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

 Jaffe raises additional grounds upon which he contends that Odesser's state claims against him should be dismissed. He asserts that Odesser's Count V, under Pennsylvania's state-law analogue to the federal RICO statute, 18 Pa.C.S. § 911 *et seq.,* must be dismissed for want of a private cause of action. As plaintiff recognizes in his memorandum of law, there is no private cause of action granted by 18 Pa.C.S. §§ 911 *et seq. Malley–Duff & Assocs. v. Crown Life Ins. Co.,* 792 F.2d 341, 347 n. 13 (3d Cir.1986), *aff'd,* — U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), *citing D'Iorio v. Adonizio,* 554 F.Supp.

222, 232 (M.D.Pa.1982). Plaintiff's Count V is accordingly dismissed.

Jaffe opposes Count VII, which alleges civil conspiracy, on essentially the same ground upon which he opposes plaintiff's RICO conspiracy allegations. Plaintiff's allegations against Jaffe of conspiracy are adequate under state common law as well as under the federal statute.

 Odesser's Count VIII alleges intentional infliction of emotional distress. In Pennsylvania, a plaintiff can only recover for emotional distress in circumstances in which "nervous shock or mental or emotional distress ... [is] accompanied by a physical injury or impact upon the complaining party." *Kazatsky v. King David Memorial Park,* 515 Pa. 183, 527 A.2d 988, 992 (1987). The only exceptions that Pennsylvania courts have adopted to this "impact rule" are for cases in which a plaintiff is in danger of and actually fears physical impact, *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84, 86 (1970), or a plaintiff suffers emotional distress from witnessing serious injury to a close relative. *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979). Odesser has alleged neither past nor prospective physical harm to himself, nor has he alleged that any close relative was physically injured in his presence. It is possible that the Pennsylvania courts will develop further exceptions to its "impact rule." It is this court's obligation in the absence of any case on point to predict what a Pennsylvania court would do if confronted by Odesser's allegations in support of a claim of intentional infliction of emotional distress. Given the gradual course of development of the tort of intentional infliction of emotional distress in Pennsylvania, I see no ground for inferring that recovery for emotional distress incident to the fraudulent seizure of control of a business interest will be recognized by the courts of the state, and I therefore find plaintiff's cursory allegations of emotional distress insufficient to state a claim.

---

5. In its cross-claim against Continental, Frankford incorporates the allegations in Odesser's complaint against Continental, and alleges that Continental and not Frankford is responsible for any damages plaintiff may have suffered.

Continental's motion to dismiss Frankford's cross-claim merely replicates its motion to dismiss Frankford's cross-claim. The motion is accordingly granted with regard to the conspiracy claim, and denied as to all other grounds.

Finally, Jaffe asserts that Odesser has failed to make allegations required to establish that Odesser has standing to sue for the legal malpractice alleged in Count IX. In this regard, a legal malpractice plaintiff must allege "[t]he employment of the attorney or some other basis for duty." *Bowman v. Abramson*, 545 F.Supp. 227, 228 (1982). In support of his standing to sue for malpractice arising from the negotiation of the Vogel loan, Odesser alleges that

> [t]he escrow agreement evidencing this loan was drafted by Gary Jaffe, Esquire ... who at that time was an attorney for PVE, Vogel and Odesser....

(Para. 16). Odesser alleges in paragraph 78 that he and his wife, Anita, were Jaffe's client with respect to the second incident of malpractice alleged in Count IX—that arising from Jaffe's negotiation of the East Texas lien in such a way as to obstruct the closing on the sale of Odesser's house. It thus appears that, assuming the truth of the facts alleged in the complaint, Gary Odesser has standing to sue Jaffe for both of the instances of malpractice that he has alleged, and Anita Odesser had standing to sue for alleged malpractice pertaining to the sale of the Odessers' residence.[6]

An appropriate Order follows.

## ORDER

For the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) Defendant Continental Bank's motion to dismiss Count IV of plaintiff's complaint (RICO conspiracy) and Count IV of Frankford Trust Company's cross-claim (same) is GRANTED.

(2) Defendant Gary Jaffe's motion to dismiss Count V (18 Pa.C.S. § 911(d)) and Count VIII (intentional infliction of emotional distress) is GRANTED.

(3) In all other respects, the motions of defendants Jaffe and Continental to dismiss plaintiff's complaint, and of Continen-

tal to dismiss Frankford's cross-claim are DENIED

(4) Continental's motion to stay discovery is DENIED.

---

**6.** In view of the determination herein of the various components of Continental's motion to dismiss, Continental's motion to stay discovery pending disposition of its motion to dismiss is dismissed as moot.